## CHAUNCEY H. ANDREWS ET AL.
### V.
## CHARLES HIMROD ET AL.

*Attachment—Sales—Special Agent—Authority of—Change in Contract
—Evidence—Damages.*

1.  A special agent having procured a purchaser for his principal's goods, on terms satisfactory to the latter, can not release the purchaser, or alter his contract in any material point.

2.  In such case consent to a change in shipping directions is not enough to constitute an assent upon the part of the principal to a change in the contract.

3.  In an action to recover commissions, alleged to have been earned by the plaintiffs as brokers in the sale of certain iron, this court holds that the trial court erred touching the assessment of damages, and that the judgment for the plaintiffs can not stand.

### [Opinion filed June 2, 1890.]

APPEAL from the Superior Court of Cook County; the Hon. JOHN P. ALTGELD, Judge, presiding.

On February 25, 1887, Daliba, Hussey & Co., iron brokers, of Cleveland, Ohio, made a written contract with Andrews & Hitchcock, appellants, iron manufacturers of Youngstown, to the effect (so far as this controversy is concerned) that Daliba, Hussey & Co., as sales agents for mine owners, had agreed to sell to Andrews & Hitchcock certain ores during the season of 1887, and that Andrews & Hitchcock were to make all of said ore into Bessemer pig iron, and give Daliba, Hussey & Co. the exclusive sale thereof at a commission of twenty-five cents per ton, but the sales were to be made subject to the directions of Andrews & Hitchcock, as to price, terms and parties to whom sold, and that Daliba, Hussey & Co. should have sole charge of all collections and receipts from such sales. In July, 1887, the following correspondence by telegraph took place between Daliba, Hussey & Co. and Charles Himrod & Co., appellees, iron dealers and brokers of Chicago.

Andrews v. Himrod.

"Chicago, July, 13, 1887.

" To Daliba, Hussey & Co., Cleveland :

" Will give twenty-two, Chicago, for three to five thousand Bessemer, if accepted to-day, and possibly to-morrow.

"Chas. Himrod & Co."

" Cleveland, July 14, 1887.

" Chas. Himrod & Co., Chicago:

" We make offer of twenty-two, twenty-five, cash, Chicago, three to five thousand tons Bessemer.    Answer.

" Daliba, Hussey & Co."

" Chicago, July 14, 1887.

" To Daliba, Hussey & Co. :

" Do you mean by telegram that you offer us three to five thousand tons Bessemer, twenty-two quarter, Chicago ?

" Chas. Himrod & Co."

" Cleveland, July 14, 1887.

" Chas. Himrod & Co.:

" Hitchcock declines to accept less than twenty-two twenty-five cash, Chicago, delivery to suit you.    Bessemer is strengthening fast, and you will find this a good buy.    Answer.

" Daliba, Hussey & Co."

" Chicago, July 14, 1887.

" Daliba, Hussey & Co.:

" Offer on Bessemer accepted for five thousand tons.    How fast can you ship ?    It is barely possible we could use some more at same price.    How much can you ship and at what deliveries?

"Chas. Himrod & Co."

" Cleveland, July 15, 1887.

" Chas. Himrod & Co.:

" Do not care to sell more Bessemer at same price.    Can deliver at rate thousand tons a month.

" Daliba, Hussey & Co."

On July 15, 1887, Daliba, Hussey & Co. mailed to appellees and to appellants, sale memoranda of the 5,000 tons iron, and appellants entered the order on their books the next day as a

sale to appellees and so notified Daliba, Hussey & Co. On July 15, 1887, appellees notified the Union Steel Company of Chicago that they had purchased for the account of the Steel Company 5,000 tons Bessemer pig-iron at the price of $22.50 cash on the cars at Chicago.

On July 14th appellees mailed this letter to the Cleveland firm :

"CHICAGO, July 14, 1887.
" MESSRS. DALIBA, HUSSEY & Co., Cleveland, Ohio :

" *Gentlemen:* We are in receipt of your telegram offering from 3,000 to 5,000 Bessemer iron, to be delivered after the coke strike ends, at $22.25 cash on board cars, Chicago. We have wired you in reply, accepting your offer for 5,000 tons and now hereby confirm the same. We wish you would mail us a letter stating the facts and giving the specifications, which we understand to be 10 per cent. phosphorous. * * *
" Very truly yours,
" CHAS. HIMROD & Co."

Between July 14th and 19th, several letters passed between appellees and Daliba, Hussey & Co., relating to the analysis of the iron, the effect of which was, that everything appellees suggested on the subject was conceded by Daliba, Hussey & Co., and appellees were informed by letter from them, of July 18th, that they could send the iron analyzing as appellees desired.

On July 19th, appellees mailed this letter:

"CHICAGO, July 19, 1887.
" DALIBA, HUSSEY & Co., Cleveland:

" *Gentlemen:* We are in receipt of yours of the. 18th. If satisfactory to you, we would like to have you make the con-ı tract directly with the purchaser of this 5,000 tons of iron, collecting from them and remitting to us the commission we make on it. The purchaser is the Union Steel Company. We will send you in duplicate contracts such as they want for the purchase of the iron. Enclosures.
" CHAS. HIMROD & Co.
" You to collect $22.50, paying us 25c."

The inclosures referred to were duplicate contracts for the sale of the iron, between appellants, of the first part, and the Union Steel Company, of the second part. The contracts were both signed in the name of appellants by Daliba, Hussey & Co., as sales agents, and returned to appellees. At the same time Daliba, Hussey & Co. wrote appellees, saying they would bill and collect direct from the Union Steel Company.

The reply of appellees was as follows:

"CHICAGO, July 22, 1887.

"DALIBA, HUSSEY & Co., Cleveland:

"We are in receipt of yours of the 21st and return herewith one copy of the contract between you and the Union Steel Co. We believe this closes the whole matter up, and it is now out of our hands. One point we meant to state which we did not. We presume it is your understanding, however, that the contract is between you and the Union Steel Company, and we are not responsible for the payment of the iron. We simply collect our 25 cents per ton. We consider them absolutely good beyond all question, standing as high as any concern, probably, in the country, but we do not like to assume a large responsibility only when it is absolutely necessary.

"Enclosure.                    CHAS. HIMROD & Co."

In that letter one of the written contracts, executed by the Steel Company, was returned to and kept by the Cleveland firm.

On July 23d, Daliba, Hussey & Co. wrote appellants:

"The 5,000 tons Bessemer iron sold to Himrod & Co., wants to be shipped to Union Steel Company, Chicago;" but no other information was given to appellants of any of the correspondence between appellees and Daliba, Hussey & Co., after appellees' telegram of acceptance, dated July 14th.

Appellants failed to deliver any part of the iron, and in consequence the Union Steel Company, about September 30, 1887, canceled the order. The price of the iron declined and the Steel Company appears to have suffered no damage. But appellees brought this suit to recover the 25 cents per ton which they would have received had the iron been delivered to the Steel Company.

The trial was before the court without a jury and judgment being given for the plaintiffs, for $1,250, the defendants appealed.

Messrs. PEDRICK & DAWSON, for appellants.

Appellees proposed to buy iron, appellants made their offer of sale, appellees accepted the offer, and their minds having met, the sale was a complete and finished sale between them, no matter whom appellees had in mind as the ultimate takers of the iron from them. Benjamin on Sales, Sec. 3.

If appellees had in mind the Union Steel Company as an undisclosed principal, the latter could do nothing more than step into the shoes of appellees. It was bound to take the contract as it was made for it, as it then existed; but the only contract the Steel Company took was for a new and different selling price, and it was thereby excluded from the position of an undisclosed party to the first contract.

If it is found that the Steel Company was in some way a party to the first transaction, then the concealment by appellees of a portion of the sale price to be paid by the company was such an act of bad faith as to deprive appellees of commissions, if earned. Story on Agency, Sec. 331.

Appellees, having held themselves out during the negotiations for the sale as buyers, and becoming such in fact, have no foundation for claiming commissions on the original transaction; and as to the sale to the Steel Company, if appellees performed any service for defendants it was as sub-agents only; also the limitations upon appellants' agents would not permit the using of appellees at appellants' expense. Campbell on Sales, 395; DeBaril v. Campoy, 20 W. N. C. 65.

Appellants were wholly ignorant of the making of any contract with the Steel Company until surprised by its production, while taking their testimony one year after this suit was begun; and the making of same by appellants' agents without the approval of appellants, was in express violation of the limitations of the agents' authority. These agents were but " sales agents," not general agents, and upon inquiry appellees might have learned the limitations upon the agents'

authority, and it was incumbent upon them to inquire.   Wharton, Com. on Agency and Agent, Sec. 137; Rawson v. Curtiss, 19 Ill. 456; Story on Agency, Sec. 133.

In making the change of vendees from appellees to the Union Steel Company, not one iota of advantage accrued to appellants.  According to the claim here made by appellees, appellants thereby undertook new and additional burdens, and were to receive therefor the exact thing that they already had, or were to have, under the first contract, that is, $22.25 per ton, and no more.   The promise of Daliba, Hussey & Co. to "collect" for appellees was in the line of accommodation only.   There was no *quid pro quo;* it was a gratuitous promise.   McLean v. McBean, 74 Ill. 134; Lake Ontario R. R. Co. v. Curtiss, 80 N. Y. 222; Wharton's Law of Contracts, Sec. 506; Fugure v. Mutual Soc., 46 Vt. 362.

There is no evidence that the Steel Company was solvent, or that the price of the iron would have ever been "collectible." An agreement to "collect" is widely different from an agreement to pay money.   The agreement, if binding, was simply to "collect," and no more.

The substance of appellees' new arrangement was a reservation to themselves of something wholly contingent on the eventuation of appellants' contract with the Steel Company, and appellees never came into such privity of contract with appellants as to be in a position to complain of the non-delivery of the iron.   Wharton on Law of Contracts, Secs. 184, 507, 784, 859; Lake Ontario Shore R. R. Co. v. Curtiss, 80 N. Y. 222; National Bank v. Grand Lodge, 98 U. S. 123.

Mr. JESSE HOLDOM, for appellees.

This whole controversy resolves itself, upon the evidence, into one single question of law, and that is as to the measure of damages which Himrod & Co. are entitled to recover from Andrews & Hitchcock by reason of the non-performance of the contract made by them with the Union Steel Company. The sales agents had notice of the increased price at which Himrod & Co. had resold the iron to the Steel Company, and, in the direct line of their duty as such sales agents, made

the contract with the Steel Company, which is in evidence in this case. Notice of such fact to the agents would bind the principals upon elementary principle, and the liability of Andrews & Hitchcock is neither increased nor diminished from the fact that the contract for the enhanced price was subsequently made by the sales agents, at the request of Himrod & Co., with the Steel Company, under the agreement to pay the excess of 25 cents per ton to Himrod & Co. If they had resold it to the Steel Company at an advance of 25 cents per ton, and Andrews & Hitchcock had failed to deliver the iron the measure of damages would be the same, viz., the profit which Himrod & Co. had in the resale to the Steel Company.

In support of this legal proposition, the court is referred to 1 Suth. on Damages, 84, where it is laid down that if the vendor has notice that his vendees have contracted to resell, the article, he will be held liable for loss of profits by such resale, if he fails to fulfill his contract, though he was not informed of the price in the contract to resell. Booth v. Spuyten Duyvil Rolling Mill Co., 60 N. Y. 487.

In Hadley v. Baxendale, 9th Exch. 341, opinion by Alderson, B., on page 353, the following is laid down as a correct rule for the measure of damages: " Where two parties have made a contract, which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally, *i. e.*, according to the usual course of things from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract, as the probable result of the breach of it." Now, the damage arising to Himrod & Co., according to the usual course of things, from the breach of this contract, is the difference in the price at which they had bought the iron from Andrews & Hitchcock, and resold it to the Steel Company; and this is the damage naturally arising from a contract of this character, as Hitchcock himself says in his testimony that he often sells iron to parties who make a lot of money out of it by resale. The doctrine laid down in this last case has been universally assented to by the courts to the present time.

Horn v. Midland Railroad Co., L. R. 8, C. P. 131; Hannah v. Shoenfelder, 47 Wis. 455.

The Supreme Court of this State have followed the rule laid down in Hadley v. Baxendale, 9 Exch. 341, in Haven v. Wakefield, 39 Ill. 509, and see Van Arnsdale v. Rundell, 82 Ill. 63.

GARNETT, J.  The suit was in attachment, the affidavit which was made by one of the appellees as a basis for the suit stating that defendants were indebted to plaintiffs for commissions as brokers in the sale of the iron.  Appellees tacitly concede that the action was commenced on a wrong theory and that the recovery, if any, must be for damages occasioned by defendants' breach of contract.  The declaration first filed consisted of the common counts only.  A special count was afterward filed by leave of court, setting up that the purchase by plaintiffs was at $22.25 per ton and the sale by them to the Steel Company at $22.50 per ton; that defendants agreed to ship and deliver the iron to the Steel Company and to collect the amounts to become due for the iron from the Steel Company, and pay to plaintiffs twenty-five cents per ton on the 5,000 tons; that thereupon the defendants entered into a written contract with the Steel Company for the sale and delivery to it of the iron (giving verbatim the contract, signed as stated, by Daliba, Hussey & Co.); that defendants failed to deliver any part of the iron and had refused to pay plaintiffs any part of the twenty-five cents per ton on same, and that by reason of defendants' failure to carry out their agreement with the Steel Company and the plaintiffs, the plaintiffs have suffered damage in the sum of $2,000.

As the judgment must rest on the special count only, it is material to inquire whether the proof supports its averments. There was probably some arrangement between appellees and the Steel Company before the 14th of July, but exactly what it was is not disclosed by the record.  No notice of that was given to appellants at any time, or to their agents until after the contract with appellees was made.  Appellants had the right to suppose appellees were the real purchasers.  The entry on appellants' books showed they did consider them the

purchasers, and concluded a negotiation which created the relation of vendor and vendee between them. That appellees understood that a contract of purchase had been effected, is manifest from their notification to the Steel Company that the purchase had been made. None of the subsequent communications between them and Daliba, Hussey & Co. operated to change appellees' contract. Utley v. Donaldson, 4 Otto, 29.

Daliba, Hussey & Co. were agents, with limited and specified powers. Having procured purchasers on terms satisfactory to, and approved by, appellants, they had no authority to release such purchasers or alter their contract in any material point. Changes in the contract assented to by appellants might have bound them, but the only change they were notified of, or consented to, was in the shipping directions. To them that was an immaterial circumstance. If this conclusion is correct, appellants made no contract, as alleged, with the Steel Company, or with appellees, to collect the amounts to become due from the Steel Company and pay to appellees twenty-five cents per ton. Everything that has the appearance of such contracts was the unauthorized action of Daliba, Hussey & Co.

Admitting, however, that a declaration can be framed according to the facts in the case, what are the damages? The court below found that the plaintiffs were entitled to recover $1,250, or twenty-five cents per ton on the whole 5,000 tons, without any proof whatever as to actual damages. That was, doubtless, on the supposed ground that appellants knew that appellees had resold the iron. See Thorne v. Mc-Veagh, 75 Ill. 81; 1 Sutherland on Damages, 84.

But, in truth, the contract with appellees was completed before either appellants, or Daliba, Hussey & Co., were informed of any resale. The ordinary rule, therefore, should prevail, which limits the damages to the difference between the contract price and the value of the goods on the market, at the time and place of delivery. 1 Sutherland on Damages, 81, 82.

The judgment is therefore reversed and the cause remanded.　　　　　　　　　　　*Reversed and remanded.*